**SECURITY PACIFIC NATIONAL BANK, Plaintiff,**

v.

**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF WILMETTE, Defendant.**

**No. 77 C 2490.**

United States District Court, N. D. Illinois, E. D.

Feb. 26, 1980.

John B. Huck, Raymond A. Fylstra, Chicago, Ill., for plaintiff.

Erwin Grombacher, Chicago, Ill., for defendant.

### JUDGMENT ORDER

ASPEN, District Judge:

This action concerns the validity of plaintiff Security Pacific National Bank's ("Security Bank") claim to a propriety interest in two savings deposit accounts at defendant First Federal Savings and Loan Association of Wilmette's ("First Federal") financial institution. The Court has jurisdiction of the parties, and jurisdiction of the subject matter pursuant to 28 U.S.C. § 1332 since there is diversity of citizenship between plaintiff and defendant and the amount in controversy exceeds the sum of $10,000. This cause was tried without a jury before this Court on January 31, February 1 and 4, 1980. Pre-trial and post-trial briefs were submitted by the parties and considered by the Court. The following are the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Security Bank is, and at all relevant times was, a national banking corporation with its principal place of business located at Security Pacific Plaza, 333 South Hope Street, Los Angeles, California. [Stipulation ¶ 1].

2. First Federal is, and at all relevant times was, a federal savings and loan association with its principal place of business located at Greenbay Road and Central Avenue, Wilmette, Illinois. At all relevant times, Jerome A. Maher ("Maher") was Senior Vice-President of First Federal. [Stipulation ¶ 2].

3. First Wilmette Corporation ("First Wilmette") is, and at all relevant times was, an Illinois corporation with its principal place of business located at Greenbay Road and Central Avenue, Wilmette, Illinois. First Wilmette Corporation is, and at all relevant times was, a wholly-owned subsidiary of First Federal. [Stipuation ¶ 3].

4. At all relevant times Aeromarine Electronics, Inc. ("Aero") was a California corporation with its principal place of business located at 6055 Fairmont Avenue, San Diego, California. [Stipulation ¶ 4].

5. At all relevant times, Money Machine, Inc. ("Money") was a Delaware corporation with a place of business located at 17291 Irvine Blvd., Tustin, California. At all relevant times, Stephen P. Lefferdink ("Lefferdink") was President of Money. [Stipulation ¶ 5].

6. Prior to September, 1975, Harry W. Booth, Jr. ("Booth") and H. Wills Booth III ("Booth III"), his son, owned a controlling interest in Aero. Prior to September, 1975, William D. Wood ("Wood") was President of Aero and Booth was Treasurer.

7. On or about August 8, 1975, Lefferdink entered into a Stock Purchase Agreement [Plf. Ex. 2] with Booth and Booth III pursuant to which Lefferdink agreed to purchase and Booth and Booth III agreed to sell to Lefferdink 1,780,000 shares of stock of Aero representing a controlling interest in said corporation.

8. As of August 8, 1975, Aero was indebted to Security Bank in the amount of approximately $112,500 for previous loans and renewals of loans from Security Bank to Aero. Payment of the said indebtedness was due on September 1, 1975. As of August 8, 1975, the said loan was unsecured, but payment was personally guaranteed by Booth and Wood.

9. On or about August 8, 1975, Booth and Wood advised Security Bank of the said Stock Purchase Agreement. Security Bank agreed to renew the loan to Aero and release Booth and Wood as guarantors on the condition that the said loan be fully collateralized.

10. On or about August 8, 1975, Wood and Booth, as President and Treasurer of Aero, respectively, executed a General Loan and Collateral Agreement [Plf. Ex. 1] and delivered the same to plaintiff. In substance, the said General Loan and Collateral Agreement grants to Security Bank a security interest in any and all property delivered to Security Bank by Aero or by others for Aero's account, whether in the past or in the future, to secure any and all then present or future obligations of Aero to Security Bank.

11. On or about September 12, 1975, Booth and Booth III transferred 1,780,000 shares of stock of Aero to Lefferdink and resigned as officers and directors of Aero.

12. On or about September 12, 1975, Lefferdink was elected as Director and Chairman of Aero. [Plf. Ex. 3]. Wood remained President of Aero.

13. On or about September 18, 1975, Lefferdink, as President of Money, and Maher, as Vice-President of First Wilmette, executed and entered into a written agreement. [Plf. Ex. 4]. The said agreement recited certain past transactions between Money and First Wilmette concerning the sale by Money and the purchase by First Wilmette of five cash dispensing machines. The said agreement provided:

> It is hereby agreed that the balance due in [sic] owing [for] all five (5) machines totals $36,021.20.

[Stipulation ¶ 6].

14. On or about September 18, 1975, First Wilmette paid the sum of $36,021.20

to Money pursuant to the said agreement. Payment was evidenced by two checks dated September 18, 1975, drawn by First Wilmette and made payable to Money. One check was in the amount of $20,000.00 and the other was in the amount of $16,021.10. [Plf. Ex. 5 and 6; Stipulation ¶ 7].

15. On or about September 18, 1975, Money opened two corporate savings deposits at First Federal, nos. 96733–1 and 96732–3. The signature cards for said savings deposits were signed by Lefferdink. [Plf. Ex. 7 and 8; Stipulation ¶ 8].

16. The said savings deposits were and are "savings deposits" authorized to be issued in accordance with regulations of the Federal Home Loan Bank Board, 12 C.F.R. § 545.1–2, and not "savings accounts" representing a share interest in the association authorized to be issued in accordance with 12 C.F.R. § 545.1 and ¶ 3(6) of defendant's Charter and By-Laws. [Plf. Ex. 9; Stipulation ¶ 9].

17. On or about September 18, 1975, Lefferdink endorsed the said checks on behalf of Money and delivered them to First Federal for deposit into the said savings deposits. $20,000.00 was deposited into savings deposit no. 96733–1 and $16,021.20 was deposited into savings deposit no. 96732–3. First Federal thereupon prepared a passbook for each of said savings deposits and delivered them to Lefferdink. [Plf. Ex. 10 and 11]. Money never made any other deposits or any withdrawals from said savings deposits. [Stipulation ¶ 10].

18. The said savings deposits earned interest at the rate of 5¼ percent per annum, compounded daily, from September 18, 1975, through June 30, 1979, and at the rate of 5½ percent per annum, compounded daily, thereafter. [Stipulation ¶ 11; 44 Fed. Reg. 33669 (1979)].

19. On or about September 22, 1975, Lefferdink, as President of Money, executed two documents on forms prepared by Security Bank entitled "Assignment" pursuant to which Money assigned the said savings deposits to Security Bank for the account of Aero. [Plf. Ex. 14 and 15]. Thereafter, Lefferdink, on behalf of Money,

delivered the said documents to Security Bank.

20. On or about September 24, 1975, Money delivered the said passbooks to Security Bank for the account of Aero as collateral for the said loan.

21. Commencing on or about September 24, 1975, and continuing to the present, Security Bank has had a pledge of and security interest in the said savings deposits to secure Security Bank's said loan to Aero.

22. Money never applied to Security Bank for any loans and Security Bank never made any loans to Money.

23. On or about September 24, 1975, Security Bank mailed the said "Assignments" to First Federal. On or about September 29, 1975, Maher, on behalf of First Federal, received and signed the said "Assignments" on behalf of First Federal underneath the following statement:

> The undersigned hereby acknowledges receipt of an executed copy of the foregoing Assignment; that the present balance in the account therein described is $____; that no prior assignments have been served against it; that it has no setoffs, claims or defenses against payment of the said account; and agrees to accept and recognize the within Assignment.

In the above blank space on each document Maher inserted the then balance of each savings deposit including interest, i. e., $20,037.64 and $16,051.35, respectively. Thereafter, Maher, on behalf of First Federal, mailed the original "Assignments" back to Security Bank. Thereafter, First Federal maintained a hold on the said savings deposits concerning any withdrawal of funds. [Stipulation ¶ 12].

24. In addition to the foregoing, Security Bank orally advised First Federal of Security Bank's security interest on or about September 22, 1975, and on or about May 3, 1976.

25. On or about October 1, 1975, in consideration of the receipt of certain collateral, including the said savings deposits of Money at First Federal, Security Bank renewed the said loan to Aero for six months

and released Booth and Wood from their said personal guarantees. [Plf. Ex. 17 and 18].

26. On or about November 26, 1975, Wood was dismissed as President of Aero and Lefferdink was appointed President in his place.

27. On or about April 1, 1976, Lefferdink, as President of Aero, executed and delivered a note to Security Bank in the amount of $97,930.08 due July 1, 1976. Said note evidenced a further renewal of part of Security Bank's existing loan to Aero. [Plf. Ex. 22].

28. On or about July 1, 1976, Aero defaulted in the payment of the said note and has at all times subsequent thereto refused to pay to Security Bank the balance due thereon.

29. Subsequent to July 1, 1976, Security Bank liquidated certain other collateral held by Security Bank to secure said loan to Aero so that the balance due from Aero to Security Bank on the said note is now $31,719.49 plus interest in the amount of $7,806.25 computed through July 1, 1977. Interest continues to accrue at the rate of $9.66 per day after July 1, 1977.

30. In addition to the foregoing, Aero is and at all times subsequent to July 1, 1976, has been indebted to Security Bank in the amount of $14,619.84 for overdrafts in two corporate checking accounts at Security Bank plus attorneys' fees and costs. [Plf. Ex. 25 and 26].

31. Subsequent to September 29, 1975, Money defaulted on its agreement with First Wilmette [Plf. Ex. 4] by failing to make operational certain cash dispensing machines previously purchased by First Wilmette from Money and by failing to deliver all components of said machines. [Stipulation ¶ 13].

32. On or about August 14, 1976, First Federal attempted to set-off the then balance of the said savings deposits in the aggregate amount of $37,534.12, including accumulated interest through June 30, 1978, against the amount of First Wilmette's claim against Money. [Stipulation ¶ 15].

First Federal accomplished this attempted set-off by debiting the said savings deposits and crediting a reserve account, not an asset account.

33. On or about November 1, 1976, Security Bank prepared two sight drafts [Plf. Ex. 29 and 30] and mailed them to First Federal together with the passbooks for the said savings deposits and the original "Assignments" [Plf. Ex. 10, 11, 14, and 15], and requested that First Federal remit to Security Bank the balance of the said savings deposits. [Stipulation ¶ 17].

34. First Federal then refused and continues to refuse to remit to Security Bank the balance of the said savings deposits. First Federal has also retained possession of the said passbooks and "Assignments." [Stipulation ¶ 18].

35. As of July 11, 1977, the date of the filing of the complaint herein, the aggregate balance in the said savings deposits would have been $38,459.32 (including interest in the amount of $2,438.12 computed through June 30, 1977), assuming First Federal had not previously transferred the balances therein to its reserves. Interest would have continued to accrue thereafter at the rate of 5¼ percent per annum, compounded daily, through June 30, 1979, and at the rate of 5½ percent per annum, compounded daily, thereafter. [Stipulation ¶ 19; 44 C.F.R. 33669 (1979)].

## CONCLUSIONS OF LAW

1. Commencing on or about September 24, 1975, and continuing to the present, Security Bank has had a pledge of and security interest in the said savings deposits to secure Security Bank's said loan to Aero.

2. The mailing by Security Bank and the receipt by First Federal of Security Bank's "Assignments" on or about September 29, 1975, constituted adequate notice to First Federal of the said pledge and security interest.

3. Any offsetting claim of First Federal accrued subsequent to September 29, 1975, when First Federal received notice of and acknowledged Security Bank's pledge and security interest.

4. By signing and returning the said "Assignments", First Federal acknowledged notice of a pledge of the said savings deposits, in writing, within the meaning of 12 C.F.R. § 545.2(c).

5. The deposits in question were "savings deposits" authorized pursuant to 12 C.F.R. § 545.1–2 and not "savings accounts" authorized pursuant to 12 C.F.R. § 545.1.

6. The sight drafts which Security Bank sent to First Federal to request payment of the said savings deposits to Security Bank are not checks or negotiable orders within the meaning of 12 U.S.C. § 1464(b)(1) and 12 C.F.R. § 545.4–1 and First Federal was not prohibited by said statute and regulation from honoring said sight drafts.

7. The balance due from Aero to Security Bank exceeds the balance of the said savings deposits, including all interest that would have accrued to the said savings deposits, including all interest that would have accrued to the said savings deposits if First Federal had not attempted a set-off by transferring the said savings deposits to its reserves.

8. Security Bank is entitled to the entire balance of the said savings deposits including all interest that would have accrued thereto if First Federal had not attempted a set-off by transferring the said savings deposits to its reserves.

Based upon the foregoing findings of fact and conclusions of law, the Court finds in favor of Security Bank and against First Federal in the amount of $45,560.84 (plus additional interest in the amount of $6.95 per day from the date of this judgment), and costs.